J-A08015-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: INVOLUNTARY TERMINATION OF PARENTAL RIGHTS TO L.J.J., A MINOR | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.R.M., MOTHER | : : : : : | |
| | : | No. 2855 EDA 2025 |

Appeal from the Decree Entered October 6, 2025
In the Court of Common Pleas of Lehigh County Orphans' Court at No(s):
A2025-0012

BEFORE:    LAZARUS, P.J., PANELLA, P.J.E., and STEVENS, P.J.E.[*]

MEMORANDUM BY LAZARUS, P.J.:                      **FILED APRIL 7, 2026**

J.R.M. (Mother) appeals from the decree, entered in the Court of Common Pleas of Lehigh County, Orphans' Court Division, involuntarily terminating her parental rights to her minor daughter, L.J.J. (Child) (born 3/23). Mother's counsel, David W. Crosson, Esquire, has also filed a petition to withdraw on appeal, pursuant to **Anders v. California**, 386 U.S. 738 (1967), and **In re Adoption of V.E.**, 611 A.2d 1267 (Pa. Super. 1992). After careful review, we affirm based upon the thorough opinion authored by the Honorable Douglas G. Reichley and grant counsel's petition to withdraw.

Mother and Child tested positive for cocaine at Child's birth. As a result, Mother was placed on a breathing tube for two days and Child was put on a breathing machine and given medications for withdrawal and seizures. Child

_____

[*] Former Justice specially assigned to the Superior Court.

remained in the Neonatal Intensive Care Unit (NICU) for five weeks following her birth, where she received rehabilitative feeding services through a nasogastric (NG) tube. The hospital referred Mother to a county-based certified recovery program, in which she was to enroll following her discharge from the hospital. Mother, however, never entered treatment.

In early April 2023, Mother admitted to a CYS caseworker that she had a history of using drugs and alcohol and that she has last used drugs the day before Child was born. *See* N.T. Termination Hearing II, 10/1/25, at 18. The caseworker explained Child's long-term medical needs and spoke to Mother about attending drug and alcohol treatment, receiving a drug and alcohol evaluation, and having an intake and assessment completed. *Id.* at 19-20. The caseworker also discussed putting a safety plan in place once Child was released from the hospital. Due to Mother missing scheduled meetings at the hospital, which involved her signing consents for Child's transfer to a rehabilitation facility, Child's NICU release was delayed. *Id.* at 21.

Mother failed to attend a scheduled consultation regarding Child's upcoming surgery, in which her NG feeding tube would be replaced with a percutaneous endoscopic gastrostomy (PEG) tube. *Id.* at 22-23. At the consultation, Mother would have learned more about the procedure, been educated about Child's post-surgical medical needs, and been advised of any necessary treatments. *Id.*

On June 23, 2023, CYS obtained emergency custody of Child, who was still hospitalized, after Mother and Father were incarcerated and "legal and

medical procedures [for Child] were necessary." *Id.* at 25. The court held a shelter care hearing on June 26, 2023. Child was adjudicated dependent on July 13, 2023, at which time CYS recommended the following for Mother: (1) obtain and maintain legal income and stable housing; (2) complete drug and alcohol evaluations and follow recommended treatment; (3) submit urine screens eight to nine times per month; (4) obtain mental health treatment and follow any recommendations; (5) cooperate with in-home services; and (6) have only supervised contact with Child. *Id.* at 27.

Following Child's PEG tube surgery, Child was released to the care of maternal aunt and uncle, a kinship resource, in July 2023. *Id.* at 28. On February 2, 2024, Child was placed in foster care,[1] during which time she required care from multiple specialists, including a speech therapist, feeding therapist, gastroenterologist, eye doctor, and dietician. *Id.* at 45. At a February 2024 permanency review hearing, which Mother did not attend,[2] the caseworker reported that Mother was not yet employed, and had not received drug and alcohol evaluations or treatment, received any mental health treatment, attended any urine screens, or reached out to CYS to coordinate visits with Child. *Id.* at 29. Moreover, Mother was still living with maternal grandmother. *Id.* Due to concerns that Child was not gaining sufficient

_____

[1] The record indicates that Child was not thriving in kinship care and, thus, necessitated a new placement where her significant medical issues could be attended to. *See infra* at 3.

[2] The permanency review order indicates that Mother told the CYS caseworker that she was in the hospital at the time of the hearing. *Id.* at 28.

weight, the court entered an order on February 8, 2024, granting CYS authority to consent to Child receiving any necessary medical treatments or procedures recommended by treating physicians. *Id.* at 32.

On February 22, 2024, Mother attended a CYS "Family Group Decision Making" meeting intended to "help support [] parents in reunification." *Id.* at 42-43. Mother, however, failed to attend a March 7, 2024 meeting with a CYS caseworker to discuss court-ordered services and steps toward reunification. *Id.* at 43. In April 2024, Mother was convicted of drug charges in Montgomery and Northampton Counties. *Id.* at 49. In June 2024, Mother reported to CYS that she had attended a drug and alcohol intake appointment, although CYS was never able to confirm that the appointment took place. *Id.* at 46. On June 2, 2024, Mother was convicted of DUI—controlled substance. *Id.* at 48.

Mother attended the first day of a continued permanency review hearing on August 1, 2024, but failed to appear for the second part of the hearing held on September 12, 2024. *Id.* at 47. On August 2, 2024, Mother was convicted of receiving stolen property and possession of a controlled substance. *Id.* at 48. Mother was released from prison on December 10, 2024. *Id.* at 49. Mother ceased contact with CYS in January 2025,[3] despite CYS caseworkers

_____

[3] Mother contacted CYS on September 5, 2025, to inform a caseworker that she was entering a rehabilitation facility to have her Suboxone adjusted. *Id.* at 54-55. However, Mother never contacted or responded to CYS after that call. *Id.* at 54. CYS was unable to confirm whether Mother had received any treatment or rehabilitative services after March 2025. *Id.* at 55. CYS arranged its last visit between Mother and Child in January 2025, although *(Footnote Continued Next Page)*

attempting to contact her by phone and performing unannounced home visits. *Id.* at 51-53.

On March 11, 2025, CYS filed a petition to involuntarily terminate Mother's parental rights under 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act. On April 21, 2025, Mother was discharged from Lehigh Valley "Families Together Program" (LVFTP). *Id.* at 52.[4] The court held a final permanency review hearing on August 2, 2025. On September 9, 2025, at the request of Mother's counsel, the court continued the scheduled termination hearing "on the grounds that a newly confirmed location for [Mother] has been revealed and that[,] therefore[, CYS] should not be allowed to proceed just by way of proof of publication [as] notice for th[e] hearing." N.T. Termination Hearing II, 10/1/25, at 4. At the conclusion of the proceeding, Mother's counsel consented to Mother receiving electronic notice of the rescheduled termination hearing. *See* N.T. Termination Hearing I, 9/9/25, at 9; *id.* at 14 ("Attorney Crosson [and the agency] are directed to provide electronic service to [M]other of the new hearing date to both the email address and by text message to the telephone number she has provided to Attorney Crosson.").

_____

Mother, unexpectedly, showed up at Child's birthday party hosted by foster parents in March 2025. *Id.* at 56.

[4] Child's PEG tube was removed in June 2025. *Id.* at 53.

- 5 -

The court held the rescheduled termination hearing on October 1, 2025. At the hearing, the following individuals testified: St. Luke's University Health Network Social Caseworker Keith Blackwell; CYS caseworkers Jared Case and Pamela Hyland; and LVFTP caseworker Alyssa Deeble.[5] Although Attorney Crosson was present at the hearing, Mother did not attend. Attorney Crosson explained to the court that he had sent Mother two emails about the rescheduled date of the termination hearing and "ask[ed] her to reach out to [him]." *Id.* at 5. Attorney Crosson indicated that he had not received a response from Mother. *Id.* Sarah E. Mussel, Esquire, counsel for CYS, told the court that CYS had provided Mother notice of the rescheduled hearing on September 9, 2025, and September 17, 2025, by email and text message, at the "email address and [cell phone] number that had been provided" to Mother's counsel and that it "did not come back undeliverable."[6] *Id.* at 5-6. Caseworker Hyland also testified that CYS had attempted to serve Mother with

_____

[5] Jacob T. Thielen, Esquire, represented Child at the hearing. No objection was made to counsel serving in a dual role as Child's legal counsel and guardian ad litem (GAL). *See id.* at 7; *see also* 23 Pa.C.S.A. § 2313(a) (requiring appointment of counsel to represent child's best legal interests in contested involuntary termination proceedings); *In the Int. of H.H.N.*, 296 A.3d 1258 (Pa. Super. 2013) (where child's legal and best interests do not diverge in termination proceeding, attorney-GAL can fulfill role of attorney appointed under subsection 2313(a)); *In re T.S.*, 192 A.3d 1080, 1088 (Pa. 2018) (when child is too young to express preference, it is appropriate for GAL to represent child's best and legal interests simultaneously in a termination of parental rights action).

[6] CYS also filed an affidavit of service indicating that CYS made service by text and email. *Id.* at 6.

the termination petition before proceeding with notice via publication. ***Id.*** at 55. ***See*** Pa.R.O.C.P. 15.6(a) (in involuntary termination of parental rights matters, "notice shall be in the form and served upon individuals as provided in 23 Pa.C.S.[A.] § 2513(b)); ***see also id.*** at § 2513(b) (notice of involuntary termination of parental rights hearing "shall be given to the parent or parents . . . by personal service or by registered mail to his [] last known address **or by such other means as the court may require**") (emphasis added).

On October 6, 2025, the trial court granted CYS' petition and involuntarily terminated Mother's parental rights to Child based on subsections 2511(a)(1), (2), (5), (8), and (b). Mother filed a timely notice of appeal. On January 5, 2026, counsel filed a petition for leave to withdraw as counsel pursuant to ***Anders***, ***supra***, and ***V.E.***, ***supra***. In ***V.E.***, our Court stated:

> [C]ounsel appointed to represent an indigent parent on a first appeal from a decree involuntarily terminating his or her parental rights, may, after a conscientious and thorough review of the record, petition this court for leave to withdraw representation if he or she can find no issues of arguable merit on which to base the appeal. Given the less stringent standard of proof required and the quasi-adversarial nature of a termination proceeding in which a parent is not guaranteed the same procedural and evidentiary rights as a criminal defendant, the court holds that appointed counsel seeking to withdraw [from] representation must submit an [***Anders***] brief[.]

***Id.***, 611 A.2d at 1275 (headnote and citations omitted). Moreover, we held that "any motion to withdraw representation, submitted by appointed counsel, must be accompanied by an advocate's brief, and not the *amicus curiae* brief delineated in [***Commonwealth v.***] ***McClendon***, [434 A.2d 1185 (Pa.

- 7 -

1981)]." **V.E.**, 611 A.2d at 1275. **See also In re Adoption of R.I.**, 312 A.3d 601, 602 (Pa. 1973) ("[T]he logic behind . . . an individual in a criminal case being entitled to representation by counsel at any proceeding that may lead to 'the deprivation of substantial rights' . . . is equally applicable to a case involving an indigent parent faced with the loss of her child.").

In his **Anders** brief, counsel raises the following issues for our consideration:

> (1) Did the [t]rial [c]ourt err by permitting the termination of parental rights hearing to move forward without [Mother] being present?
>
> (2) Did the [t]rial [c]ourt err by terminating [Mother's] parental rights based on the grounds for involuntary termination set forth [in] . . . [subsections] 2511(a)(1), (2), (5), and (8), because [CYS] did not establish by clear and convincing evidence that [Mother's] parental rights should be terminated?

**Anders** Brief, at 4.

Before reaching the merits of Mother's appeal, we must first address counsel's petition to withdraw. To withdraw under **Anders**, counsel must:

> 1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) furnish a copy of the [**Anders**] brief to the [appellant]; and 3) advise the [appellant] that he or she has the right to retain private counsel or raise additional arguments that the [appellant] deems worthy of the court's attention.[7]

_____

[7] Mother has not retained alternative counsel or raised any additional arguments *pro se* on appeal.

*Commonwealth v. Cartrette*, 83 A.3d 1030, 1032 (Pa. Super. 2013) (en banc) (citing *Commonwealth v. Lilley*, 978 A.2d 995, 997 (Pa. Super. 2009)). With respect to the third requirement of *Anders*, that counsel inform the appellant of her rights in light of counsel's withdrawal, this Court has held that counsel must "attach to [his] petition to withdraw a copy of the letter sent to [his] client advising [] her of [her] rights." *Commonwealth v. Millisock*, 873 A.2d 748, 752 (Pa. Super. 2005).

> An *Anders* brief must also comply with the following requirements:
>
> (1) provide a summary of the procedural history and facts, with citations to the record;
>
> (2) refer to anything in the record that counsel believes arguably supports the appeal;
>
> (3) set forth counsel's conclusion that the appeal is frivolous; and
>
> (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Commonwealth v. Santiago*, 978 A.2d 349, 361 (Pa. 2009). Finally, this Court must "conduct an independent review of the record to discern if there any additional, non-frivolous issues overlooked by counsel." *Commonwealth v. Flowers*, 113 A.3d 1246, 1250 (Pa. Super. 2015) (footnote omitted).

Instantly, Mother's counsel filed a petition to withdraw, certifying that he reviewed the record and determined that Mother's appeal is frivolous. Counsel also filed a brief, which includes a summary of the history and facts of the case, potential issues that could be raised by Mother, and counsel's

assessment of why those issues are wholly frivolous, with citations to relevant legal authority. Counsel has provided Mother with a copy of the brief and a letter advising her of her right to retain new counsel or raise additional issues *pro se*.[8] Accordingly, we find that counsel has substantially complied with the requirements of **Anders** and **Santiago**, and, thus, may review the issues raised by counsel and also conduct our independent review of the record.

Our standard of review in termination of parental rights cases is well-settled:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

---

[8] Although counsel's letter does not expressly state that Mother may proceed "*pro se*" or "raise any points that she deems worthy of the court's attention in addition to points raised by counsel" in his **Anders** brief, the letter does state, "Please note that whether or not the Court grants my [a]pplication to [w]ithdraw, you have the right to represent yourself and participate in the appeal, or to hire private counsel." **Anders** Letter, 1/5/26, at 1 (unpaginated). Thus, we find that counsel has substantially, "if not perfectly," complied with the dictates of **Anders**. *See Commonwealth v. Wrecks*, 934 A.3d 1287, 1290 (Pa. Super. 2007).

After careful review of the parties' briefs, the applicable case law and statutes, and the certified record on appeal, we affirm the trial court's decree involuntarily terminating Mother's parental rights, under subsections 2511(a)(2) and (b), on the basis of the opinion authored by the Judge Reichley.

First, counsel consented to CYS serving Mother electronically, via email and text message, with notice of the rescheduled termination hearing; thus, CYS met the notice requirement, and the trial court was permitted to proceed in Mother's absence. *See* N.T. Termination Hearing I, 9/9/25, at 9-10, 14.

Second, Mother's "repeated and continued incapacity [has] caused [C]hild to be without essential parental care, control[,] or subsistence necessary for [her] physical or mental well-being and the conditions and causes of the incapacity . . . cannot or will not be remedied by [Mother]," 23 Pa.C.S.A. § 2511(a)(2). *See* N.T. Termination Hearing II, 10/1/25, 60, 78-81, 83 (caseworkers testifying Mother made no progress with court's service plan over span of case); *id.* at 57 (Child had been in placement—with same foster family who is adoptive resource—for 20 months at time of termination hearing); *id.* at 51 (last arranged visit with Child Mother attended was in January 2025); *id.* at 81, 86 (Mother often "cancelled or no-showed" to visits with Child; from July 2024-April 2025, Mother attended only nine visits); *id.* at 60 (Mother has been in and out of jail in multiple counties throughout life of case); *id.* (Mother had active bench warrants in two different counties at time of termination hearing); *id.* at 58, 68 (Child thriving with foster family,

is "very attached to her foster parents," whom she refers to as "Mommy and Daddy," and "has significantly progressed medically" since being placed with foster family);[9] *id.* at 70 (foster mother is stay-at-home parent to Child and foster parents have five other biological children who have bonded with Child); *id.* at 60, 89-90 (foster parents provide Child's day-to-day needs, a "good home . . . [that s]he is doing very well [in,]" and Child is "happy and healthy with [foster parents]"); *id.* at 65 (foster parents continue to communicate with Child's extended biological family and have "expressed to [caseworkers] that they think it's important for [Child] to know her biological family"); *id.*at 71 (foster parents have expressed desire to maintain contact between Mother and Child "if [Mother is] healthy and in a good situation to have contact with [Child]"). Moreover, CYS caseworker Hyland testified that terminating Mother's parental rights would "serve [Child's] needs" and that it was "not realistic for [Child] to reunify with [Mother] at this point." *Id.* at 60.

We instruct the parties to attach a copy of Judge Reichley's opinion in the event of further proceedings in the matter.

Decree affirmed. Motion to withdraw granted.

_____

[9] At the time of the termination hearing, Child was no longer was seeing specialists, other than an eye doctor. *Id.* at 69.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/7/2026

Filed 12/04/2025 1:08:29 PM , Clerk of Orphans' Court Division, Lehigh County, PA

Filed 12/4/2025 3:19:00 PM Superior Court Eastern District
2855 EDA 2025

# IN THE COURT OF COMMON PLEAS OF LEHIGH COUNTY, PENNSYLVANIA
## ORPHANS' COURT DIVISION

*A08015-26*

| | | |
|---|---|---|
| *In re*: Involuntary Termination of | : | Superior Court No. **2855 EDA 2025** |
| Parental Rights to | : | |
| **L.J.J.** | : | Orphans' Court No. **A2025-0012** |
| A Minor | : | |

### PA. R.A.P. 1925(a) Statement

The Lehigh County Office of Children and Youth Service ("LCOCYS" or "Petitioner") filed a *Petition for Involuntary Termination of Parental Rights of [J.R.M.], Mother, Pursuant to Sections 2511 and 2512 of the Adoption Act* on March 11, 2025, regarding the minor female child L.J.J. born March _ , 2023 (Child").[1] After a hearing held October 1, 2025,[2] which Child's mother, J.R.M. ("Mother"), did not attend, and upon consideration of the uncontested testimony adduced at the hearing, the undersigned on October 6, 2025, entered a Final Decree involuntarily terminating Mother's parental rights pursuant to 23 Pa. C.S. §2511(a)(1), (2), (5), (8), and (b), a copy of which is attached hereto and which is hereby incorporated by

---

[1] LCOCYS also filed a petition pursuant to 23 Pa. C.S. §2511 regarding the minor's father ("Father"). On August 27, 2025, Father filed a petition to voluntarily relinquish his parental rights to Child pursuant to 23 Pa. C.S. §2501, which the undersigned granted by Final Decree entered October 6, 2025.

[2] The hearing was originally scheduled for September 9, 2025, but was continued that date upon oral motion of counsel for Mother. Notes of Testimony from September 9, 2025, were filed November 19, 2025.

reference. Mother filed a Notice of Appeal and Concise Statements of Errors Complained of on Appeal ("Concise Statement") on November 5, 2025. The Notes of Testimony of the October 1, 2025, termination hearing were filed November 17, 2025. The undersigned notes at the outset that Child was represented in these proceedings by Jacob T. Thielen, Esquire, in a dual role as counsel and guardian *ad litem* as there was no conflict of interest between the two-year-old Child's legal interests and her best interests.

In Mother's Concise Statement, Mother complains the Court abused its discretion by 1) allowing the hearing to proceed in Mother's absence over her counsel's objection; 2) finding that Petitioner proved by clear and convincing evidence that statutory grounds exist upon which to terminate Mother's parental rights; and 3) finding that termination of Mother's parental rights serves Child's needs and welfare. Upon careful review of the Notes of Testimony, it is clear from the record that counsel for Mother did not object to proceeding with the §2511 hearing on October 1, 2025.

[THE COURT:] Attorney Crosson, have you been able to have any contact with your client?

MR. CROSSON: Your Honor, after that last hearing, I sent an email over to her to the email that she had provided to me previously, advising her of the new date and asking her to reach out to me.

I did know that she was going to be in rehab or approximately two weeks. So I was hopeful that after those two weeks she would come out and contact me. She did not contact me.

I sent another email to her yesterday just to again alert her of today's hearing and to have her reach out to me via email as soon as possible. And as of today, I have not yet received a response.

N.T., Oct. 1, 2025, 5:4-17.

Although Attorney Crosson acknowledged he had not received a response from Mother regarding the October 1, 2025 hearing, he did not raise an objection to the hearing being conducted in her absence. Therefore, this issue is waived.

With regard to Mother's arguments, the Petitioner failed to provide a basis for termination of Mother's parental rights, this case began when LCOCYS became involved with this family on March 20, 2023, after receiving a referral containing allegations that Mother and Child were both impacted by substance use.[3] When Child was born on March ., 2023, both Mother and Child experienced respiratory issues related to Mother's abuse of illicit substances. Mother had to be intubated and Child was on a breathing machine. N.T., Oct. 1, 2025, 9-10, 15:21-24. Child also had feeding concerns, required a feeding tube, was receiving morphine to aid symptoms of opiate withdrawal, and needed medication for seizures. *Id.* at 11. Mother remained in the Intensive Care Unit ("ICU") of the St. Luke's University Health Network, Anderson Campus, for a few days, and Child remained in the Neonatal ICU

---

[3] The outcome of the investigation into the referral was later determined to be valid because illicit substances were present in both Mother's and Child's systems. N.T., Oct. 1, 2025, 15:23-16:4. 20:15-19.

3

("NICU") for approximately five weeks.[4] Upon discharge from the NICU, the Child was transported to Good Shepherd Rehabilitation Hospital ("Good Shepherd") for continued treatment and rehabilitation related to her feeding difficulties. *Id.* at 11:13-17.

While Child was in the NICU, hospital staff had difficulty reaching Mother and difficulty getting her consent to medical procedures Child needed. In addition, Mother did not visit Child regularly to spend time bonding with Child and learning how to care for Child's medical needs. The majority of Mother's visits occurred after hours when hospital staff were not available to help educate Mother on the Child's medical needs. Additionally, hospital staff noticed that Mother at times appeared to be under the influence of substances while she was visiting Child. *Id.* at 12:11-13:22, 18:22-19:16. Due to her documented history of substance abuse, hospital staff connected Mother with certified recovery specialists through a county-based program, Treatment Trends, but found out later that Mother failed to follow up and did not enter substance abuse treatment after Child was born. *Id.* at 11:24-12:10.

Child was at Good Shepherd between the middle of June of 2023 through the end of July of 2023. During this time, it was medically recommended that Child

---

[4] According to Jared Case, LCOCYS caseworker, Child was in the NICU for roughly six weeks, whereas Keith Blackwell, a social work case manager for St. Luke's University Health Network during the first two to three weeks of Child's life, estimated Child was in the NICU for four to five weeks. N.T., Oct. 1, 2025, 11:10, 20:20-21:3.

4

undergo surgery to place a feeding apparatus into her stomach rather than continuing use of the feeding tube through Child's nose. After missing at least one meeting to educate and gain consent from Mother for the procedure, Mother did eventually sign consent documentation for the surgery. *Id.* at 22:1-13.

LCOCYS took emergency custody of Child on June 22, 2023, after Child's parents were both incarcerated. A shelter care hearing took place in the Juvenile Division of this Court on June 26, 2023, and Child was adjudicated dependent after hearing held July 13, 2023, which Mother did not attend. *Id.* at 25:1-26:5. The Juvenile Division ordered Mother to engage in the following services designed to effectuate reunification:

1. Obtain and maintain legal income and stable housing;
2. complete a drug and alcohol evaluation and any recommended treatment;
3. submit urine screens to demonstrate sobriety eight to nine times per month;
4. obtain a mental health evaluation and follow through with any recommendations;
5. have no unsupervised contact with Child; and
6. cooperate with in-home reunification services.

Permanency review hearings were held February 8, 2024, August 1 and September 12, 2024 (a two-day hearing), March 24, 2025, and August 4, 2025. Mother was in attendance on August 1, 2024, but did not attend the other

permanency review hearings, with the possible exception of the August 4, 2025, permanency review hearing.[5] *Id.* at 26:25-27:9, 31:1-3, 47:22-24, 49:3-6.

After Child had surgery on or about July 19, 2023, to place the feeding tube into her stomach, she was released to the kinship home of her maternal aunt and uncle, who lived approximately two blocks from where Mother lived with her own mother. Formal visitation was not set up, and Mother could have visited Child by making informal arrangements with her sister. Mother visited Child just twice between July 19, 2023, and February 8, 2024. *Id.* at 28:2-11, 29:14-23.

Due to concerns over whether Child's medical and nutritional needs were adequately being met in light of her inadequate weight gain and her being measured at the first percentile of weight and height for children her age, she was placed into foster care on February 2, 2024, when she was 10 months old. *Id.* at 42:14-17. She has remained with the foster family ever since. From her birth, Child has never been in Mother's care.

Mother's court-ordered services remained the same throughout the dependency proceedings, except to the extent that her supervised visits with Child were decreased. *Id.* at 48:2-5, 53:10-12, 57:9-17. Although the court-ordered services were designed to help effectuate reunification, Mother did not make any

---

[5] Petitioner's Exhibit P-1 does not include the Permanency Review Order from August 4, 2025, and the testimony adduced at the parental termination hearing did not establish whether she attended the August 4, 2025 permanency review hearing.

notable progress toward reunification by the time of the termination hearing on October 1, 2025. *Id.* at 60:9-20, 78:6-22. With respect to the requirement that she obtain and maintain legal income, Mother did not maintain consistent employment throughout the duration of the dependency proceedings. *Id.* at 46:13-15, 49:12-15, 80:1-12. She consistently told the in-home reunification worker, Alyssa Deebles with Lehigh Valley Families Together ("LVFT"), that she relied on her grandparents to provide for her financially, and she did not follow through on efforts to obtain employment. There was not any evidence presented on how much financial support Mother's grandparents provided to her. *Id.* at 80:1-9.

Mother was also required to obtain and maintain stable housing. When she was communicating with the LCOCYS caseworkers involved with the family, she consistently stated that she was living at her mother's house. *Id.* at 54:5-11, 80:1-9. However, when caseworkers tried to visit Mother at that location, she was not there.[6] *Id.* at 17:16-18:2. At times, her family indicated her whereabouts were unknown to them. *Id.* at 30:11-22. Throughout the duration of the dependency proceedings,

---

[6] We note that LCOCYS caseworker Jared Case successfully met with Mother at maternal grandmother's home on April 5, 2023, after several unsuccessful attempts. Child was still in the NICU at the time. Mr. Case went over the court-ordered services with her, expressed the importance of visiting Child regularly during hours when hospital staff could help train Mother regarding Child's medical needs, and the importance of visiting Child while not under the influence. N.T., Oct. 1, 2025, 18:3-20:14. It does not appear that his conversation with Mother resulted in a change in Mother's behavior.

Mother was in and out of jail in a variety of counties and she had active, outstanding bench warrants. *Id.* at 48:16-49:6, 72:13-15. For significant periods of time, Mother's whereabouts were unknown to LCOCYS.

With regard to the court-imposed requirements that Mother complete a drug and alcohol evaluation and a mental health evaluation, and follow through with any recommended treatment, it appears that Mother did not comply. *Id.* at 55:7-17, 57:3-17. She repeatedly told Ms. Deebles she had an evaluation with a service provider called Clean Slate and that she was involved in ongoing mental health treatment there. However, when LVFT sought to verify Mother's claims, Clean Slate clarified that Mother engaged only in a drug and alcohol intake interview and nothing more, leading to a conclusion Mother lied when she repeatedly claimed to be in treatment with Clean Slate. *Id.* at 78:23-79:25.

Mother told Ms. Deebles that she submitted to a drug and alcohol evaluation while incarcerated at Montgomery County Prison, but when Ms. Deebles offered to transport Mother to the prison to retrieve those records so Mother could substantiate her compliance and satisfy LCOCYS, Mother failed to respond and never produced the records. Mother did not have any contact with her LCOCYS caseworker from mid-January, 2025 until early September, 2025. *Id.* at 63:19-64:7. During the conversation with her caseworker in January, 2025, Mother stated she was engaged

8

in mental health treatment through a virtual program called Ophelia.[7] The caseworker was unable to verify the claim because she could not reach Mother to have her complete consent forms that would enable LCOCYS to receive information from the Ophelia program. *Id.* at 46:22-47:7. Mother also relayed to Ms. Deebles that she was working with the Ophelia program. Although Mother told Ms. Deebles she would sign consents for verification of the treatment, Mother never completed the consent forms. *Id.* at 78:23-79:25.

Mother made additional claims about obtaining treatment that could not be verified. After not having any contact with LCOCYS or LVFT since January of 2025, Mother contacted the LCOCYS caseworker on September 5, 2025, shortly before the September 9, 2025 hearing.[8] During the call, the caseworker asked Mother where she had been for the past nine months. Mother indicated she had been in a drug rehab program for about a month and a half and needed to promptly return to a rehab in order to adjust the dosing on Suboxone injections she was taking. Mother did not identify a specific rehab facility where she had been or where she would be going, and she did not state where she had been for the rest of the nine months that her whereabouts were unknown. Without the name of the facility and signed consents from Mother, LCOCYS was not able to verify whether Mother actually

---

[7] In this program, clients provide urine samples through the mail in furtherance of substance abuse treatment.

[8] See note 2, *supra.*

attended substance abuse treatment. *Id.* at 54:15-55:17. In sum, there was not any time during the pendency of the related dependency proceedings that the Agency was able to verify that Mother complied with the Court-ordered services to obtain a drug and alcohol evaluation or a mental health evaluation, or that she complied with any treatment recommendations.

Another requirement in the related dependency proceedings was that Mother submit urine screens eight to nine times per month in order to demonstrate her sobriety. Services were set up at service provider Averhealth to facilitate this requirement, but Mother did not provide any urinalysis to Averhealth throughout the pendency of the related dependency proceedings. LVFT offered transportation to Averhealth, but Mother always declined a ride and refused to go. *Id.* at 78:6-22.

Mother was referred on two occasions to court-ordered in-home reunification services. LVFT attempted to provide services the first time between March 11, 2024, and May 24, 2024, but LVFT did not meet in person with Mother during that period. Services were discontinued when Mother was incarcerated. *Id.* at 43:4-25. LVFT provided services again between July 3, 2024, and April 21, 2025, at which point Mother was discharged due to not having any contact with LVFT since January of 2025. *Id.* at 51:19-52:2. Both times, LVFT tried to work on specific goals with Mother, namely substance, abuse, mental health, and employment and income, but Mother did not meet any of the goals.

10

In addition to the goals stated above, LVFT also supervised Mother's visits with Child. Although many visits were scheduled, Mother attended visits sporadically and inconsistently. She attended only nine visits throughout LVFT's involvement with the family. *Id.* at 81:19-24. Initially, visits were scheduled weekly for two hours, but they were decreased to one hour every two weeks due to Mother's frequent cancellations and no-shows. Mother blamed the cancellations and no-shows on transportation issues with her friends and family. Mother was consistently offered rides by LVFT to and from the scheduled visits with the Child, but Mother declined the offers. At times, Mother cancelled visits at the last minute or failed to show up after confirming she would attend the visit. *Id.* at 80:13-81:12.

LVTF supervised three visits that took place in July of 2024, and at least three visits which occurred between the beginning of December 2024 and January 27, 2025. *Id.* at 45:7-16, 56:17-19, 83:1-4, 86:14-18. When both LCOCYS and LVFT lost contact with Mother at the end of January of 2025, additional visits were not scheduled. *Id.* at 57:1-8. Mother's very last visit with Child occurred on March 19, 2025, when Mother attended Child's birthday party in the community as supervised by Diakon. Child's foster family extended an invitation to Child's extended biological family, and Mother showed up unexpectedly. Since January of 2025, Mother has not contacted LCOCYS or LVFT to request that visits resume. *Id.* at 50:10-51:14.

11

Even prior to LVFT's involvement, Mother was sporadic and inconsistent with visitation both when Child was in the NICU and when Child was placed with a maternal aunt and uncle in very close proximity to Mother's alleged residence. *Id.* at 29:14-23. Mother's only period of consistent visitation with Child occurred during a period of incarceration. Mother obtained authorization to have weekly virtual visits with Child. *Id.* at 62:1-15. The record is not clear as to who supervised these visits or the duration that virtual visits took place. However, these virtual visits appear to have been short-lived. According to Exhibit P-1 at page 32, it appears the Juvenile Dependency Division of this Court entered an Order on December 5, 2024, indicating visits between Mother and Child would be virtual while Mother remains incarcerated at the Northampton County Jail. Credible testimony established that Mother was released from incarceration on December 10, 2024. Therefore, it appears that for a period of five calendar days, Mother exercised her virtual visits with Child. *Id.* at 62:16-23.

In light of Mother's lack of compliance and progress with all of the court-ordered services designed to help effectuate Mother's reunification with Child, the undersigned found the Agency's petition to terminate Mother's parental rights pursuant to 23 Pa.C.S. §2511(a)(1), (2), (5), and (8) was well-established. Child has been continuously in placement with LCOCYS since July 13, 2023, and has not been in Mother's direct care since she was born. Throughout this time, as demonstrated

12

above, Mother has not shown interest in performing parental duties or taking the steps necessary to provide Child with the essential parental care, control, or subsistence she needs for her physical and mental well-being. (*See* 23 Pa.C.S. §2511(a)(1) and (2).)

The Agency filed its petitions to involuntarily terminate Mother's parental rights to Child on March 11, 2025, approximately 20 months after the Court placed Child in the custody of LCOCYS. In those 20 months, Mother did not exhibit any willingness to do what the Agency told her she must do in order to regain custody of Child, not even attend supervised visits consistently. Since Child was placed in the Agency's care on July 13, 2023, Mother and Child have had fewer than a dozen supervised visits together. Child is now two-and-a-half years old, and Mother is still not in a position to assume custody of Child.

Mother has not remedied her failure and refusal to provide essential parental care for Child in a reasonable time, in excess of the six-month and 12-month time frames established by 23 Pa.C.S. §2511(a)(5) and (8). Mother chose not to avail herself of the services and assistance that were available for the duration of time the Child has been in LCOCYS custody, all of which were designed to help Mother remedy the conditions that led to Child's removal. Mother has been content to allow others to provide the essential parental care Child requires. "Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's

13

parental responsibilities while others provide the child with his or her physical and emotional needs." In re Adoption of B.G.S., 245 A.3d 700, 706–07 (Pa. Super. 2021), reargument denied (Mar. 11, 2021).

Mother is neither ready nor able to resume parental duties. At the time of the termination hearing, Mother's whereabouts were again unknown. She had not submitted any urine screens to demonstrate sobriety, had not completed a drug and alcohol evaluation or a mental health evaluation, and did not sign appropriate releases to allow LCOCYS to substantiate her claims of treatment. Since late January of 2025, she did not request to resume visits with Child. N.T., Oct. 1, 2025, 83:1-4. She has not seen Child since March 19, 2025. She has not cooperated with in-home reunification services. *Id.* at 59:21-24. Moreover, when the termination hearing took place, Mother had active bench warrants in both Northampton and Montgomery Counties that were unresolved. *Id.* at 72:13-15.

In the meantime, Child has been thriving in the foster home, and her medical situation has improved significantly. She previously had been required to consult with numerous specialists, including a gastroenterologist, a speech therapist, a feeding therapist, a dietician, and an eye doctor. At the time of the termination hearing, she was only seeing two doctors: an eye doctor for an issue with lazy eye and her regular pediatrician. *Id.* at 69:7-17. Her feeding tube was removed in June of 2025 and has not been needed for feedings since January of 2025. *Id.* at 53:21-

14

54:1. Notably, Mother was permitted and encouraged to attend Child's medical appointments and was informed of appointments through LVFT, but Mother did not attend any of Child's medical appointments. *Id.* at 52:6-17.

Mother does not seem able to summon the ability, or the interest, to handle the responsibilities of parenting, and there is no reason to prolong Child's involvement with the foster care system. *See* In re Z.S.W., 946 A.2d 726, 732 (Pa. Super. 2008) (holding child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting"). Child is placed in a legal risk foster home, and the foster family looks forward to adopting Child if parental rights are terminated. Reunification with Mother is unrealistic at this time; therefore, the undersigned determined that termination of Mother's parental rights would best serve Child's needs and welfare. (*See* 23 Pa.C.S. §2511(a)(5) and (8).)

An analysis of the Child's needs and welfare pursuant to 23 Pa.C.S. §2511(b) indicates there is an insufficient bond between the Child and Mother. The Child has lived in the foster home since February 2, 2024, and has been outside of Mother's care since birth. After Child left the NICU, Mother had fewer than a dozen visits with Child during her lifetime. When visits did occur, Mother was a stranger to Child, and it was clear from Child's behavior that Child does not have a bond with Mother. At the beginning of visits, Child would cling to her foster mom and cry for

15

her, but with help Child eventually calmed down. She would nevertheless look out the window and call out, "Momma!" while looking for her foster mom. During visits, Mother was attentive to Child and tried to engage Child with some success, but Child was more drawn to her foster parents. *Id.* at 82:2-25. Child does not refer to Mother with any name or particular word, but she calls her foster parents "Mommy" and "Daddy." *Id.* at 58:9-19, 82:22-25.

Child is very attached to her foster parents. She is happy and healthy in their home. She is bonded to the foster parents' biological children, who are all older than Child, and they are bonded to Child. Her foster parents take care of all of her day-to-day needs, and they managed her past medical needs, which were significant, with tremendous success. *Id.* at 70:5-25. The foster parents consider it important for Child to know her biological family, and they maintain good communication with the extended biological family. They are open to having contact with the biological family as long as both parents are healthy and the contact is beneficial for Child. *Id.* at 71:1-11. For all of the above reasons, the undersigned determined that Child's needs and welfare would best be addressed by termination of Mother's parental rights so Child can be adopted by her foster parents in order to advance her developmental, physical and emotional needs and welfare.

**IT IS ORDERED** that the Clerk of the Orphans' Court shall forthwith transmit the record to the Superior Court for the adjudication of the aforesaid appeal.

**BY THE COURT:**

Date: December 1, 2025

Douglas G. Reichley, J.

17